1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

BRANCH BANKING AND TRUST
COMPANY, a North Carolina banking
corporation,

Plaintiff,

v.

SMOKE RANCH DEVELOPMENT, LLC, a
Nevada limited liability company, YOEL INY,
an individual; NOAM SCHWARTZ, nan
individual; YOEL INY, Trustee of the Y & T
INY FAMILY TRUST dated June 8, 1994, as
amended; NOAM SCWARTZ, Trustee of the
NOAM SCHWARTZ TRUST dated August
19, 1999; D.M.S.I., LLC, a Nevada limited
liability company; and DOES 1 through 10,
inclusive,

Defendants.

Case No. 2:12-cv-00453-APG-NJK

**Order Granting Partial Summary Judgment
in Favor of Plaintiff**

(Dkt. ## 79, 80, 81, 82, 106)

     Branch Banking & Trust ("BB&T") has sued Smoke Ranch Development, LLC and

several other defendants (collectively, "Defendants") alleging breaches of a promissory note and

related guaranties.  BB&T's claims arise from (1) a Promissory Note made payable to Colonial

Bank, N.A. in the principal amount of $800,000 (Dkt. #79-4) (the "Smoke Ranch Loan" or

"Promissory Note"), (2) a Deed of Trust securing that Promissory Note against certain real

property in Clark County, Nevada ("Smoke Ranch Property"), and (3) Commercial Guaranties

entered into by Smoke Ranch's co-defendants (Dkt. #1-3).

    Defendants have filed two motions for summary judgment.  In the first (Dkt. #79),

Defendants allege that BB&T lacks standing to enforce the Promissory Note and the Deed of

Trust.  In the second (Dkt. #82), Defendants allege that BB&T has not complied with NRS §

1

40.459(1)(c), which caps the amount of a deficiency judgment a creditor may receive when it has purchased enforcement rights from someone else. Defendants also have asked me to certify questions of law to the Nevada Supreme Court regarding the proper interpretation of NRS § 40.459(1)(c). (Dkt. #106.)

BB&T also filed two motions, the first of which (Dkt. #80) seeks summary judgment as to liability against the Defendants for breaches of the Promissory Note and the Guaranties. BB&T's second motion (Dkt. #81) requests a deficiency judgment hearing to determine the amount of its expected judgment. Because all of the pending motions derive from the same facts, I will address all of them in this Order. The following facts are undisputed, except where noted:

1.      On September 26, 2005, Smoke Ranch executed a Promissory Note in favor of Colonial Bank, N.A. in the principal amount of $800,000, which had a maturity date of April 1, 2007. (Dkt. 79-3.)

2.      As security for the Promissory Note, Smoke Ranch executed a Deed of Trust encumbering the Smoke Ranch Property; the Deed of Trust was recorded on October 21, 2005. (Dkt. #79-4.)

3.      On October 6, 2005, Defendants Yoel Iny, Noam Schwartz, Y & T Family Trust, Noam Schwartz Trust, and DMSI LLC executed Guaranties regarding payment of the Promissory Note. (Dkt. #86 at 46-72.)

4.      The parties to the Promissory Note amended it through an unrecorded Change in Terms Agreement dated May 9, 2008, which extended the maturity date to April 1, 2010. (Dkt. #86 at 67.)

5.      On August 14, 2009, the Alabama State Banking Department closed Colonial Bank and the FDIC was named receiver in order to liquidate and distribute the bank's assets. (Dkt. #86-3 at 56.)

6.      On October 23, 2009, Tamara Stidham,[2] Karen Lugan, and Teresa Griswold executed a Bulk Assignment of Colonial Bank's assets from the FDIC to BB&T, but back-dated the Bulk Assignment's effective date to August 14, 2009.  (*Id*. at 72.)  Under the Bulk Assignment, the FDIC assigned all of its

> rights, title and interests in and to all those certain Mortgages, Security Deeds, Deeds to Secure Debt, Deeds of Trust, . . . , and all such other instruments and security agreements securing loans owned . . . and held of record by Colonial Bank or any of its predecessors as of August 14, 2009 in the Public Records of the Counties of the State of Nevada and all modifications, extensions, amendments and renewals.

(Bulk Assignment, Dkt. #86 at 71.)  The Bulk Assignment was recorded in Clark County, Nevada on November 3, 2009. (*Id*. at 70.)  The Bulk Assignment does not specifically reference, nor was it recorded against, the Smoke Ranch Property.

7.      BB&T has submitted an Allonge that it asserts was "executed by the FDIC thereby assigning all rights, title and interest to BB&T."  (Harms Declaration, Dkt. #86-3 at 54 ("Harms Dec.").)  The Allonge states that it is to be attached to the Promissory Note; it references Colonial Bank N.A. and Smoke Ranch Development, LLC., the May 9, 2008 date of the Change in Terms Agreement, the Loan account number and the principal amount of $800,000. (Dkt. #86-1 at 9.)  The Allonge also states that it became effective as

---

[2] Colonial Bank employed Ms. Stidham as assistant general counsel during the two-year period preceding the FDIC receivership.  (Stidham Depo. Dkt. #79-13 at 12.)  She then became BB&T's associate general counsel.

3

of August 14, 2009, although there is no date of execution. (*Id.*)  Only Tamara Stidham's signature is on the signature block. (*Id.*)  The Allonge is not attached to any other document, such as the Promissory Note or Change in Terms Agreement.

8.     Defendants point to a December 11, 2009 FDIC Limited Power of Attorney naming Tamara Stidham, among others, as its attorney-in-fact.  (Dkt. # 79-16 at 2-3).  Defendants emphasize that because that document was not executed until December 2009, Tamara Stidham was not authorized to execute the Allonge at the time of the Bulk Assignment notwithstanding the fact that this Limited Power of Attorney states that it shall be effective as of August 14, 2009 (the date of the Bulk Assignment). (Dkt. #79 at 16.)

9.     BB&T also has produced a document entitled Purchase and Assumption Agreement Whole Bank All Deposits Among FDIC and BB&T ("PAA"), dated August 14, 2009. (Dkt. #86-1 at 65.)  The PAA includes provisions structuring the asset purchase.  Section 3.1 states that, subject to express exclusions in Sections 3.5 and 3.6, BB&T purchased all of the FDIC's rights, title, and interest in all of Colonial Bank's

> Assets (real, personal and mixed, wherever located and however acquired) . . . . [The attached and incorporated] Schedules 3.1[4] and 3.1a[5] sets [sic] forth certain categories of [the] Assets [purchased under the PAA.  Such schedule is based upon the best information available to [FDIC] and may be adjusted as provided in Article VIII . . . . [BB&T] specifically purchases all mortgage servicing rights and obligations of [Colonial Bank].

(PPA, Dkt. #86-1 at 25.)  Schedule 3.1 refers to an "Attached List" and states:

---

[4] Schedule 3.1 relates to "Certain Assets Purchased." (Dkt. #86-1 at 58.)

[5] Schedule 3.1(a) relates to "Subsidiary and Other Business Combination Entities Acquired." (Dkt. #86-1 at 59.)

4

> THE LIST(S) ATTACHED TO THIS SCHEDULE (OR SUBSCHDULE(S)) AND THE INFORMATION THEREIN, IS AS OF THE DATE OF THE MOST RECENT PERTINENT DATA MADE AVAILABLE TO THE ASSUMING BANK AS PART OF THE INFORMATION PACKAGE.  IT WILL BE ADJUSTED TO REFLECT THE COMPOSITION AND BOOK VALUE OF THE LOANS AND ASSETS AS OF THE DATE OF BANK CLOSING.  THE LIST(S) MAY NOT INCLUDE ALL LOANS AND ASSETS (E.G., CHARGED OFF LOANS).  THE LIST MAY BE REPLACED WITH A MORE ACCURATE LIST POST CLOSING.

(*Id.* at 58.)    Despite this reference, no list is attached to the PAA.  BB&T asserts that the "Note was listed in Schedule 4.15(B) of the [PAA,] establishing that the Note was among the commercial loans acquired." (Dkt. #86 at 10 (citing Exhibit 8 to BB&T's Response, Dkt. #86-2 at 60-61).)  Exhibit 8 bears the heading "Non-Single Family Asset Detail for 10103 – Colonial Bank," indicates that it is found on "Page 61 of 273," and identifies the Smoke Ranch Loan.

Section 3.5 of the PAA identifies the following Colonial Bank assets as being excluded from purchase:

> (b) any interest, right, action, claim, or judgment against . . . (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank . . . .

(*Id.* at 28.)  The second exclusion section, Section 3.6(a), provides that the FDIC had the right to refuse to sell any Asset otherwise acquired under the PAA if the FDIC determined that the Asset was essential to the FDIC. (*Id.* at 29.)  Such Assets included those that the FDIC determined to be: "the subject of any investigation relating to any claim with respect to any item described in Section 3.5(a) or (b), or the subject of, or potentially the subject of, any legal proceedings." (*Id.*)  Nothing in the record indicates that the Smoke

Ranch Loan was subject to any investigation or any legal proceedings as of the date the Bulk Assignment and PAA were executed.

10.     On November 15, 2012, the FDIC and BB&T executed an Assignment of Deed of Trust, Loan Documents and Other Claims, which was recorded against the Smoke Ranch Property, dated ("2012 Assignment"). (Dkt. #79-12.)   That document states: "THIS ASSIGNMENT OF DEED OF TRUST, LOAN DOCUMENTS AND OTHER CLAIMS ("Assignment") is executed as of November 13, 2012, but is made effective as of August 14, 2009 ("Effective Date")...." (*Id.*)  It further provides:

> 1.  Assignment of Loan Documents.  As of the Effective Date, [the FDIC] hereby assigns, sets over and transfers to [BB&T] all of its right, title and interest in, to and under the Loan and all the Loan Documents set forth on Exhibit "A"[6] . . . together with all amendments, extensions, renewals and modifications thereto, including all of [the FDIC's] claims, demands, rights, remedies and interests therein, to have and to hold the same unto [BB&T], its successors and assigns.

(*Id.* at 3-4.)

## ANALYSIS

### I.     Defendants' Motion for Summary Judgment (Dkt. #79.)

Defendants contend that BB&T lacks standing to bring its claims because the Bulk Assignment did not specifically describe the Deed of Trust and was not recorded against the Smoke Ranch Property. (Dkt. #79 at 14-16.)  Defendants argue the 2012 Assignment and the Allonge do not cure the Bulk Assignment's defects because a party must have standing at the outset of litigation, and a defect in standing at the outset cannot be cured. (*Id.* at 12.)  Finally, Defendants assert that BB&T is collaterally estopped from relying on the PAA because the

---

[6] Exhibit "A" lists each of the documents that form the Smoke Ranch Loan. (*Id.* at 6.)

Nevada state court has already determined that BB&T Is not the proper successor to Colonial Bank (although Defendants improperly raise this argument only in their Reply). (Dkt. #94 at 10).

### 1.     UCC Art. 3 challenge

"The proper method of transferring the right to payment under a mortgage note is governed by Article 3 of the Uniform Commercial Code—Negotiable Instruments, because a mortgage note is a negotiable instrument." *Leyva v. Nat'l Default Servicing Corp.*, 255 P.3d 1275, 1279 (Nev. 2011).  UCC § 3-301 provides three methods by which a person can become entitled to enforce a note, two of which are relevant here: a person must either be a "holder" of the note, or attain the status of a "nonholder in possession of the [note] who has the rights of holder." UCC § 3-301(a)(1)-(2).

### (i)     BB&T has failed to establish that it has attained the status of "holder."

A person is a "holder" if the person possesses the note and either (1) the note has been made payable to the person in possession, or (2) the note is payable to the bearer of the note. UCC § 1-201(b)(21)(A).  This inquiry requires examination of the face of the note and any endorsements.  An endorsement means a signature, other than that of the maker, made for the purpose of negotiating the instrument. UCC § 3-204(a).  This inquiry also includes determining whether any purported allonge was sufficiently affixed. *Id.*; *In re Weisband*, 427 B.R. 13, 19 (Bankr. D. Ariz. 2010) (assignee failed to demonstrate it was the holder of the note because while it was in possession of the note, it provided no evidence that the endorsement was stapled or otherwise attached to the rest of the note); *In re Shapoval*, 441 B.R. 392, 394 (Bankr. D. Mass. 2010) (same).

Here, the Promissory Note was payable to Colonial Bank. (Dkt. #86 at 23.)  The Allonge includes Tamara Stidham's endorsement (in her capacity as FDIC's attorney-in-fact), and states

that it is to be affixed to the Note.  While the copy of the Promissory Note attached to BB&T's

Response includes the Allonge, the copy attached as an exhibit to BB&T's Motion for Summary

Judgment does not include the Allonge. (Dkt. #80-1 at 2.)  This is not sufficient to establish that

the Allonge was affixed to the Note.  Thus, BB&T has not established that it is the holder of the

Promissory Note.  In order to enforce the Promissory Note, BB&T instead must prove it became a

"nonholder in possession of the instrument who has the rights of a holder" under UCC § 3-

301(a)(2).

   **(ii)**   **BB&T is a nonholder in possession of the Promissory Note and is entitled to enforce it.**

  "An instrument is transferred when it is delivered by a person other than its issuer for the

purpose of giving to the person receiving delivery the right to enforce the instrument." UCC § 3-

203(a).  "Transfer of an instrument, whether or not the transfer is a negotiation, vests in the

transferee any right of the transferor to enforce the instrument. . . ." UCC § 3-203(b).  While the

failure to obtain the endorsement of the payee or other holder does not prevent a person in

possession from being the "person entitled to enforce" the note, the possessor does not have the

presumption of a right to enforce.  Rather, the possessor of the note must demonstrate both the

fact and the purpose of the delivery of the note to the transferee in order to qualify as the "person

entitled to enforce." *Leyva*, 255 P.3d at 1281.

  Here, the Bulk Assignment is sufficient to demonstrate the purpose of delivery: transfer to

BB&T of all of the FDIC's "rights, title and interests in and to all those certain Mortgages,

Security Deeds, Deeds to Secure Debt, Deeds of Trust, . . . , and all such other instruments and

security agreements securing loans owned . . . and held of record by Colonial Bank or any of its

predecessors as of August 14, 2009." (Dkt. #81 at 65.)  Attached to BB&T's supplemental brief

(Dkt. #114-1 at 29) is Dennis Harm's Declaration, which confirms the delivery of the Promissory Note to BB&T.

> BB&T has possession of the original of the following: (i) the Promissory Note, dated September 26, 2005 that was executed by Smoke Ranch Development, LLC in the original principle amount of $800,000.00; (2) the Deed of Trust and identified Assessor Parcel Number 138-22-102-004 executed by Smoke Ranch Development, LLC; (iii) each Commercial Guaranty dated September 26, 2005. . . ; and (iv) the Change in Terms Agreement dates as of May 9, 2008 executed by Smoke Ranch Development, LLC.

(*Id.* at 30.) This is sufficient to establish that the FDIC delivered the Promissory Note to BB&T, that BB&T possesses the original Promissory Note, and that the purpose of the delivery was to give BB&T the entitlement to enforce the Promissory Note. Accordingly, BB&T is a nonholder in possession of the Promissory Note and is entitled to enforce it.

### 2. Defendants may not rely on Nevada's foreclosure statute, statute of frauds, or recording statutes to challenge BB&T's entitlement to enforce the Promissory Note.

On February 29, 2012, BB&T foreclosed on the property secured by the Deed of Trust. (Trustee's Deed Upon Sale, Dkt. #81-1 at 31.) Defendants assert that BB&T's foreclosure was invalid because it failed to comply with Nevada's recording statutes and statute of frauds. (Dkt. #79 at 14-16.) BB&T responds that the Bulk Assignment and the PAA, taken together, satisfy the statute of frauds. (Dkt. #86 at 12.) BB&T further asserts that the recording statutes are inapplicable because they do not provide a remedy in the foreclosure context. (*Id.*)

Defendants rely on NRS § 106.210, which requires that an assignee properly record the assignment of a deed of trust before it can foreclose on the real property encumbered by that deed of trust.[7] But this provision is inapplicable here because the statutory language at issue was added

---

[7] NRS 106.210 is made applicable to deeds of trust by NRS 107.070, which states that "[t]he provisions of NRS 106.210 . . . apply to deeds of trust as therein specified."

9

on July 1, 2011, well after the Bulk Assignment was executed (October 23, 2009, back-dated to August 14, 2009).  Prior to July 1, 2011, the statute read:

> 1. Any assignment of a mortgage of real property, or of a mortgage of personal property or crops recorded prior to March 27, 1935, and *any assignment of the beneficial interest under a deed of trust may be recorded*, and from the time any of the same are so filed for record shall operate as constructive notice of the contents thereof to all persons.

> 2. Each such filing or recording shall be properly indexed by the recorder.

(Emphasis added.)  After it was amended by Laws 2011, c. 81, § 14.5, eff. July 1, 2011, the statute now provides:

> 1. *Any . . . assignment of the beneficial interest under a deed of trust must be recorded* in the office of the recorder of the county in which the property is located, and from the time any of the same are so filed for record shall operate as constructive notice of the contents thereof to all persons. . . . *If the beneficial interest under a deed of trust has been assigned, the trustee under the deed of trust may not exercise the power of sale pursuant to NRS 107.080 unless and until the assignment is recorded* pursuant to this subsection.

> 2. Each such filing or recording must be properly indexed by the recorder.

(Emphasis added.)  The Statutory Notes to the amendment provide that "[t]he amendatory provisions of . . . Section 1 of this act apply only to . . . any assignment of the beneficial interest under a deed of trust, which is made on or after October 1, 2011."  Moreover, the Nevada Supreme Court applied the earlier version of the statute to a note and deed of trust in a similar case in which the assignment occurred before the statute was amended but the foreclosure occurred after. *Edelstein v. Bank of New York Mellon*, 286 P.3d 249, 253 nn.3 & 5 (Nev. 2012).  Accordingly, the pre-2011 version of the statute applies in this case.

Defendants try to distinguish *Edelstein* by pointing out that, unlike the individual assignment of the deed of trust at issue in *Edelstein*, here the Bulk Assignment does not

specifically identify the Promissory Note or Deed of Trust.  Defendants also point to the 2012 Assignment as an indication that BB&T "did not have a valid assignment of the Promissory Note in dispute until November 13, 2012." (Dkt. #79 at 12.)  But these arguments are of no moment. The Bulk Assignment assigned all notes and deeds of trust owned or held by Colonial Bank that were not specifically excluded from assignment.  Defendants have provided no evidence that the subject loan was excluded from the Bulk Assignment.  Moreover, the 2012 Assignment is more akin to "belt and suspenders": it was not needed to assign the Promissory Note and Deed of Trust because they had already been transferred through the Bulk Assignment.  And although the 2013 Assignment was executed November 13, 2012, it was specifically made effective as of August 14, 2009, the date the FDIC took control of Colonial Bank. (Dkt. #79-12 at 2.)  This further reflects the parties' intent that the Promissory Note and Deed of Trust were transferred from Colonial Bank to the FDIC and then to BB&T through the Bulk Assignment.

Similarly, Defendants' reliance on Nevada's statute of frauds is misplaced.  NRS 111.205(1) provides that real property interests shall be assigned only in writing, subscribed by either the assigning party or by that party's lawful agent.  "The purpose of the statute of frauds is to prevent a contracting party from creating a triable issue concerning the terms of the contract— or for that matter concerning whether a contract even exists—on the basis of his say-so alone." *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002).  Here, the documents, taken as a whole, confirm that the Promissory Note and Deed of Trust were assigned to BB&T in writing. Thus, the statute of frauds is satisfied.

The Bulk Assignment is sufficient evidence of the assignment of the Promissory Note and Deed of Trust from the FDIC to BB&T.  Because the Bulk Assignment occurred prior to the amendment to NRS 106.210, the statute's earlier language controls.  BB&T was not required to

record an individual assignment against the subject property before foreclosing on it, and thus it properly foreclosed.

### 3. Plaintiffs are not collaterally estopped from relying on the PAA.

Defendants also assert that the doctrine of issue preclusion requires dismissal of BB&T's claims because the Nevada state court has previously ruled that BB&T was not the proper successor in interest to Colonial Bank. *See Murdock v. Rad, et. al.*, 10-A-574852 (Decided June 18, 2010), *affirmed by R & S St. Rose Lenders, LLC v. Branch Banking & Trust Co.,* 56640, 2013 WL 3357064 (Nev. May 31, 2013)). (Dkt. #94 at 7.)  That case arose from a priority fight between BB&T and Saint Rose Lenders, LLC.  The issue central to determining priority was whether BB&T had met its burden of proving that it received an assignment of Colonial Bank's interest in a 2007 Deed of Trust relating to a $43 million construction loan.  (Dkt. #79-15 at 5.)

The trial court refused to admit into evidence two previously undisclosed documents: the Bulk Assignment (the same one at issue here) and an unrecorded assignment specifically prepared in connection with the loan at issue. (*Id.* at 6.)  The court also denied BB&T's request to reopen discovery.  "The court found that there was no competent, admissible evidence offered by BB&T to establish whether the loan, note and deed of trust were excluded pursuant to [the PAA's] Sections 3.5 and/or 3.6 *or* purchased by BB&T pursuant to Section 3.1." (*Id.*)  Thus, the deed of trust might fall into one of the PAA's exclusion categories.  In the absence of evidence to the contrary, the court found that BB&T held a second priority lien position behind the St. Rose Lender's Deed of Trust. (*Id.* at 28.)

> Although BB&T repeatedly attempted to couch the issue as one of standing, it is not a standing issue.  Rather, the defect which prompts the dismissal of BB&T's claims is evidentiary.  BB&T failed to meet its burden of proof to establish that the Colonial Bank loan, note and deed of trust at issue in this case were ever assigned to BB&T.  The court has given BB&T ample opportunity to submit proper evidence that the Colonial Bank loan, note and deed of trust

at issue in this case were one of the assets acquired by BB&T when it purchased some of the Colonial Bank assets.   BB&T instead relied upon the language of the [PAA], and no other admissible evidence, documentary or testimonial.   The Court hereby finds that [the PAA] was not sufficient evidence, on its face, to establish that BB&T was assigned the 2007 Colonial Bank Deed of Trust.

(*Id*. at 6-7.)

On appeal, the Nevada Supreme Court noted that:

"the FDIC [has the] ability to designate specific assets and liabilities for purchase and assumption . . . [and] a Court should look to the purchase and assumption agreement governing the transfer of assets between the FDIC and a subsequent purchaser of assets of a failed bank to determine which assets and corresponding liabilities are being assumed."

(Dkt. 94-2 at 6 quoting *Caires v. JP Morgan Chase Bank*, 745 F.Supp.2d 40, 48-49 (D. Conn. 2010).)   The court agreed with the district court:

The PAA was an asset purchase and therefore the district court looked to its language in order to determine which assets and corresponding liabilities were transferred to BB&T.   However, due to the omission of the schedules of assets, the district court found that PAA did not transfer the Construction Loan to BB&T.   We agree. . . .

(*Id*. at 7.)

Defendants also rely on *Branch Banking & Trust Co. v. Nevada Title Co.*, 2:10-CV-1970-JCM-RJJ, 2011 WL 1399833 (D. Nev. Apr. 13, 2011). (*See* Dkt. #94 at 9.)   In that case, Judge Mahan of this Court concluded that the state court's decision in *Murdock* was issue preclusive as to BB&T's complaint against a title company for "breach of contract not removing the [St. Rose Lenders trust deed] from the title to the property," among other things. 2011 WL 1399833 at *2.   The court concluded that BB&T did not have standing to bring those claims because the state court had already determined that BB&T did not acquire those rights. *Id*. at *2-4.

These cases do not support the conclusion that BB&T is precluded from bringing this action.  To the contrary, it appears that BB&T may have learned its evidentiary lesson from *Murdock*.  In Nevada, the elements necessary for application of issue preclusion are: (1) the issue decided in the prior litigation must be identical to the issue presented in the current action; (2) the initial ruling must have been on the merits and have become final; (3) the party against whom the judgment is asserted must have been a party or in privity with a party to the prior litigation; and (4) the issue was actually and necessarily litigated. *Five Star Capital Corp. v. Ruby*, 194 P.3d 709, 713 (Nev. 2008).  I need look no further than the first prong.

As quoted above, the decision in *Murdock* was based on the BB&T's lack of evidence. (Dkt. #79-15 at 6 ("[T]he defect which prompts the dismissal of BB&T's claims is evidentiary.").)  The court either excluded from evidence or simply did not consider the Bulk Assignment and other relevant documents.  Here, however, the Bulk Assignment is in evidence, as are several related documents.  Accordingly, *Murdock* is not controlling here, and BB&T is not issue precluded from enforcing its rights under the Promissory Note.

For the reasons discussed above, Defendants' Motion for Summary Judgment (Dkt. #79) is denied.

**II.   BB&T's Motion for Summary Judgment (Dkt. #80) and Defendants' Motion for Summary Judgment (Dkt. #82)**

BB&T moves for summary judgment on its breach of the Promissory Note and Guaranties. (Dkt. #80.)  Defendants respond that BB&T cannot prove the consideration it paid for the right to enforce the debt as required under NRS § 40.459(1)(c). (Dkt. #89 at 4.)  Defendants also assert that because BB&T did not timely comply with NRS §163.120, which establishes

procedures for asserting contract claims against a trust, BB&T cannot assert its claims against the defendant trusts. (*Id*. at 4-5.)

### 1. Defendants' objection to the Harms Declaration is overruled.

As an initial matter, Defendants object to the Declaration of Dennis Harms (BB&T's custodian of records), which authenticates 11 documents including the Promissory Note, Guaranties, Deed of Trust, Bulk Assignment, and 2012 Assignment. (Dkt. #89 at 5-6.) Defendants argue that Harms has no personal knowledge of the documents. (*Id*. at 7.) The objection is overruled. "A witness does not have to be the custodian of documents offered into evidence to establish Rule 803(6)'s foundational requirements." *United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (citing *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir.1991)); *see also Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1353 (9th Cir.1987), *modified on other grounds*, 866 F.2d 318 (9th Cir.), *cert. denied*, 493 U.S. 871 (1989). "The phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system." *Ray*, 930 F.2d at 1370.

Harms' Declaration states that he is familiar with the books, records, and files, and that those items were maintained in the ordinary course of business of Colonial Bank, the FDIC, and BB&T. There is no requirement that BB&T establish when and by whom the documents were prepared. *Id*. (citing *United States v. Huber*, 772 F.2d 585, 591 (9th Cir.1985) ("there is no requirement that the government show precisely when the [record] was compiled"); *United States v. Basey*, 613 F.2d 198, 201 n. 1 (9th Cir.1979) (college records properly admitted to establish defendant's address even though the custodian did not herself record the information and did not know who did), *cert. denied*, 446 U.S. 919 (1980)).

### 2. BB&T is entitled to summary judgment as to liability for breach of contract.

It is undisputed that the Promissory Note and Guaranties are valid contracts.  It is also undisputed that the Defendants defaulted on the Smoke Ranch Loan.  As a result, BB&T seeks entry of judgment for liability on those contracts, and then for a deficiency hearing to determine the amount of the judgment.  Defendants counter that BB&T has failed to provide the proof of the consideration that it paid for the assignment of the rights under the Promissory Note and Deed of Trust, as required under NRS § 40.459(1)(c).  That statute provides:

> 1. After the hearing, the court shall award a money judgment against the debtor, guarantor or surety who is personally liable for the debt. The court shall not render judgment for more than:
>
> . . . .
>
> (c) If the person seeking the judgment acquired the right to obtain the judgment from a person who previously held that right, *the amount by which the amount of the consideration paid for that right* exceeds the fair market value of the property sold at the time of sale or the amount for which the property was actually sold, whichever is greater, with interest from the date of sale and reasonable costs, whichever is the lesser amount. (Emphasis added.)

The language in subsection (1)(c) limiting recovery to the amount of consideration paid was added by the Nevada Legislature in 2011 through Assembly Bill 273 ("AB 273").  *See* 2011 Nevada Laws Ch. 311.  The prior version of NRS § 40.459 provided:

> After the hearing, the court shall award a money judgment against the debtor, guarantor or surety who is personally liable for the debt. The court shall not render judgment for more than:
>
> 1. The amount by which *the amount of the indebtedness which was secured* exceeds the fair market value of the property sold at the time of the sale, with interest from the date of the sale; or
>
> 2. The amount which is the difference between the amount for which the property was actually sold and *the amount of the indebtedness which was secured,* with interest from the date of sale, whichever is the lesser amount. (Emphasis added.)

This change in the statutory language negatively impacts the rights of a creditor to recover a deficiency amount.

> *Following the enactment of NRS 40.459(1)(c), a successor holder is now limited in its recovery,* in a deficiency action or suit against the guarantor, to the sum by which the amount paid for the "right to obtain the judgment" exceeds the greater of the fair market value or the actual sale price. Under NRS 40.459(1)(c), no award may be made for other amounts that the successor in interest may have incurred following the acquisition of the right to obtain the judgment, such as accrued interest, costs and fees, and any advances, as provided in NRS 40.451 and NRS 40.465. *Thus, NRS 40.459(1)(c) attaches a new disability to a successor lienholder's ability to obtain a deficiency judgment.*

*Sandpointe Apts. v. Eighth Jud. Dist. Ct.*, 129 Nev. Adv. Op. 87, 313 P.3d 849, 855-56 (2013) (emphasis added).  BB&T contends that the new language does not apply to it because it acquired the debt in 2009 (before the new language was adopted), although the foreclosure sale occurred in February 2012 (after the new language went into effect).  BB&T asserts that its rights under the loan documents vested when it purchased the asset in 2009, and applying the 2011 amendment would constitute an impermissible retroactive application of the statute. (Dkt. #88 at 10.)

The Nevada Supreme Court held last year that the new language of NRS § 40.459(1)(c) applies only to *foreclosures* that were completed after it went into effect. *Sandpointe*, 129 Nev. Adv. Op. 87, 313 P.3d 849, 857 (Nev. 2013).  Judge Jones of this Court recently went further and held that the new statutory language would violate the Contract Clause of the United States Constitution if it applied to *assignments* that were completed before the statute's effective date. *Eagle SPE NV I, Inc. v. Kiley Ranch Communities*, 3:12-CV-00245-RCJ, 2014 WL 1199595 (D. Nev. Mar. 24, 2014).

In *Sandpointe*, the FDIC became the receiver of Silver State Bank in 2008. 313 P.3d at 851.  In 2009, the debtor, Sandpointe, defaulted on its loan. *Id*.  In 2010, the FDIC sold the Sandpoint loan and guaranty to Multibank pursuant to a large structured sale. *Id*.  In turn, Multibank transferred its interest in the loan and guaranty to its subsidiary CML-NV, whose sole

17

purpose was to pursue collections. *Id*. In early 2011, before enactment of AB 273, CML-NV

foreclosed on the property. *Id*. at 851-52.  After the June 10, 2011 enactment of AB 273, CML-

NV filed a complaint for breach of contract and deficiency. *Id*. at 852.  Sandpointe moved for

partial summary judgment, seeking application of the "consideration paid" requirement newly

added to NRS § 40.459(1)(c). *Id*.  CML-NV filed a countermotion for summary judgment arguing

that the new statutory language could not apply retroactively. *Id*. The district court granted the

countermotion, holding that NRS § 40.459(1)(c) could apply only to loans entered into after June

10, 2011.  The Nevada Supreme Court agreed.

> In Nevada, the sale of the secured property is the event that vests
> the right to deficiency.  Following the trustee's sale, the amount of a
> deficiency is crystalized because that is the subject date for
> determining both the fair market value and trustee's sale price of
> the property securing the loan. *See* NRS 40.459(1); *In re Filippini*,
> 66 Nev. 17, 22, 202 P.2d 535, 537 (1949) (defining a "vested right[
> ]," in relevant part, as "some interest in the property that has
> become fixed and established").)  "In other words, the fair market
> value of the property is determined on the day of the trustee's sale,
> and that value can be used in a future deficiency action." *Id*.
> Further, NRS 40.462(1), which governs the distribution of
> foreclosure sale proceeds, provides that the right to receive
> proceeds from the sale vests at the time of the foreclosure sale; it is
> logical that the right to a judgment for the amount not received in a
> foreclosure sale would arise on the same date as the right to receive
> amounts received from the sale. The trustee's sale marks the first
> point in time that an action for deficiency can be maintained and
> commences the applicable six-month limitations period.

*Id*. at 856.  Thus, the court held that if the trustee's sale occurred before the effective date of NRS

§ 40.459(1)(c), application of the statute would impermissibly impact rights that had already

vested in the foreclosing party. *Id*. at 859.  The court emphasized the presumption against

retroactivity. *Id*. at 857-58 (citing  *U.S. Fid. & Guar. Co. v. United States ex rel. Struthers Wells
Co.*, 209 U.S. 306, 314 (1908) ("The presumption is very strong that a statute was not meant to

act retrospectively, and it ought never to receive such a construction if it is susceptible of any

other.")).

The Nevada Supreme Court concluded its analysis of vested rights as of the date of the trustee's sale. *Id*. at 856.  Judge Jones of this Court recently went further and determined that the right to obtain a deficiency judgment vests at the time the contract is entered into.

> Although the present right to collect a deficiency of a particular amount does not vest until a foreclosure sale, the right to obtain a deficiency judgment in the future (based upon the ownership of the debt) is a valuable contingent right held by the creditor before any foreclosure proceedings commence.  That right is in a sense already vested before foreclosure because the ability to foreclose exists only if the debtor owes the creditor a certain amount of money.  The foreclosure is just an action upon the security, and a deficiency judgment is just a remedy whereby the action upon the security will not frustrate the creditor's ability to make himself whole on the debt.

*Eagle SPE*, 2014 WL 1199595 *5. *See also Royston v. Miller*, 76 F. 50, 53-54 (C.C.D. Nev. 1896)( "A vested right is property arising from contract or from the principles of the common law, which cannot be destroyed, divested, or impaired by legislation.").

> [NRS § 40.459 (1)(c)] speaks to the time that an assignee acquires the *right* to obtain a deficiency judgment, not the time that an assignee actually obtains the deficiency judgment itself. The "right" referred to in the statute, i.e., the right "acquired" by the assignee, is the contingent right to obtain a deficiency judgment upon foreclosure, because it is a right "*to obtain* the judgment" in the future.  This reading is further supported by the fact that the statute notes that the assignee obtains this right "from a person who previously held that right," i.e., the assignor. And the statute clearly does not contemplate that the assignor already had a deficiency judgment, because the statute begins, "If the person *seeking* the judgment acquired the right to obtain the judgment from a person who previously held that right." Plaintiff interprets the statute as if it read, "If the person seeking *to enforce* the judgment acquired the judgment from a person who previously held that *judgment,* the amount by which the amount of the consideration paid for that *judgment* exceeds the fair market value of the property. . . ." The statute does not so read.

*Eagle SPE,* 2014 WL 1199595 at *6 (emphasis and omission of internal citations in original).[8]

Judge Jones then examined whether the retroactive application of NRS § 40.459 (1)(c) would

violate the Contract Clause of Article 1, § 10 of the United States Constitution, which provides

that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."   Determining

whether a state law violates the Contract Clause involves a three-step inquiry:

> The threshold inquiry is whether the state law has, in fact, operated as a substantial
> impairment of a contractual relationship.  If this threshold inquiry is met, the court
> must inquire whether the State, in justification, [has] a significant and legitimate
> public purpose behind the regulation, such as the remedying of a broad and general
> social or economic problem, to guarantee that the State is exercising its police
> power, rather than providing a benefit to special interests.  Finally, the court must
> inquire whether the adjustment of the rights and responsibilities of contracting
> parties is based upon reasonable conditions and is of a character appropriate to the
> public purpose justifying the legislation's adoption.  Unless the State itself is a
> contracting party, as is customary in reviewing economic and social regulation, . . .
> courts properly defer to legislative judgment as to the necessity and reasonableness
> of a particular measure.

*Id.* at *7 (quoting *RUI One Corp. v. City of Berkeley,* 371 F.3d 1137, 1147 (9th Cir. 2004)

(internal citations and quotation marks omitted in original)).

As to the threshold inquiry, "the statute substantially impairs any existing assignment by

reducing the amount an assignee can recover on debt he already purchased under a legal regime

where his potential recovery was not limited by the amount he paid for the debt, and without any

refund or other benefit offsetting the loss in value." *Id.* at *7.

---

[8]   *Eagle SPE* addressed four loans that Colonial Bank made to the defendants between April
2007 and February 2008. *Id* at *1.  Following Colonial Bank's failure, the FDIC assigned those
loans to BB&T in the same August 14, 2009 Bulk Assignment at issue in the present case. *Id.*
BB&T assigned its rights in those four loans to Eagle SPE in August 2010. *Id.*  On November 8,
2011, Eagle SPE foreclosed on the property and brought a deficiency action against the
defendants. *Id.* at *1-2.

As to the second step, the court found that while the amendment had a legitimate public purpose (remedying the broad social and economic problems flowing from widespread real estate foreclosures), retroactive application to pre-enactment assignments would benefit special interests. Specifically, the statute provides "a windfall to a particular class (mortgagors) that could not have been reasonably expected under the mortgage and assignment when made, to the detriment of another distinct class (mortgage assignees)." *Id.* at *8. While contractual rights may be impaired "where reasonably necessary to prevent unexpected windfalls," here the statute "*creates* an unexpected windfall as opposed to avoiding one." *Id.* (emphasis in original, citations omitted.)

> [T]he impairment of the contract here thwarts the reasonable expectations of mortgage assignees and provides a windfall to mortgagors that could not have been reasonably expected from the contract under the law existing when the contract was made. The law is therefore more in the character of a special interests benefit than a neutral exercise of the police power.

*Id.*

As to the third step, the court held that if the statute was applied to pre-enactment assignments, the resulting adjustment to the contracting parties' rights and responsibilities would be based on unreasonable conditions. *Id.* The statute would impair the value of the asset (the right to collect the debt), and this result cannot withstand scrutiny. *Id.* at 11 (citing *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 445 (1934) (conditions reasonable where the "integrity of the mortgage indebtedness is not impaired" and the "right of a mortgagee-purchaser to title or to obtain a deficiency judgment . . . are maintained")). Judge Jones explained:

> [A]n assignee's reliance upon the ability to collect the full amount owed under the mortgage is vital. An assignee who purchases a defaulted mortgage under the amended statute can only profit thereby if the value of the security is greater than the price of the assignment plus the costs of foreclosure. And this will almost never be the case in practice, because where the value of the security

21

minus the costs of foreclosure is greater than the price of a prospective assignment, no rational lender will sell the mortgage at such a price in the first place. The lender is better off foreclosing himself and realizing a smaller loss than he is selling the mortgage for less than he can get through foreclosure. This, of course, was the entire purpose of the statute: to eliminate the economic incentive for banks to sell defaulted mortgages rather than negotiate directly with homeowners.

2014 WL 1199595 at *11.  Moreover, less restrictive alternatives were available to serve the purposes of the law:

The Nevada Legislature could simply have prohibited outright the assignment of defaulted mortgages on Nevada real property, or permitted them only for a fixed percentage of the amount due on the loan. In either case, no assignee would face the unexpected, retroactive destruction of the value of his contract that Plaintiff faces here, because the law affecting any assignment contract would be known at the time of assignment, and not only afterwards. That option would also have prevented the sale of mortgages at discount rates. Similarly, the Nevada Legislature could have provided additional pre-foreclosure safeguards to encourage foreclosure alternatives.

*Id*. at *12.  Further, the application of the statute to pre-enactment assignments does nothing to advance the Legislature's stated purpose of encouraging negotiation between mortgagees and mortgagors; assignees had no reason to think that the value of their contracts would be limited when they purchased mortgages before the law took effect. *Id*.  Thus, the statute, if applied retroactively, would adjust the contracting parties' rights and responsibilities based on unreasonable conditions, and therefore would violate the Contract Clause.

The holding and rationale of *Eagle SPE* apply with equal force in this case.  The Bulk Assignment and PAA were executed on August 14, 2009, so BB&T acquired the asset well before NRS § 40.459(1)(c) became effective.  Retroactively applying that statute to the facts of

1  this case would violate of the Contract Clause.  Accordingly, BB&T is entitled to judgment as to

2  liability for breach of contract and breach of guaranty.[9]

3  **3.    NRS § 163.120**

4  The Trust Defendants assert that BB&T failed to comply with NRS § 163.120(2), which

5  sets forth notice requirements for a plaintiff suing a trust for breach of a contract entered into by a

6  trustee. (Dkt. #89 at 5-6.)  The statute provides as follows:

7

8  > A judgment may not be entered in favor of the plaintiff in the action
9  > unless the plaintiff proves that within 30 days after filing the action,
   > or within 30 days after the filing of a report of an early case
10 > conference if one is required, whichever is longer, or within such
   > other time as the court may fix, and more than 30 days before
11 > obtaining the judgment, the plaintiff notified each of the
   > beneficiaries known to the trustee who then had a present interest. .
12 > . of the existence and nature of the action. The notice must be given
   > by mailing copies to the beneficiaries at their last known addresses.
13 > The trustee shall furnish the plaintiff a list of the beneficiaries to be
   > notified, and their addresses, within 10 days after written demand
14 > therefor, and notification of the persons on the list constitutes
   > compliance with the duty placed on the plaintiff by this section.
15 > Any beneficiary . . . may intervene in the action and contest the
   > right of the plaintiff to recover.
16

17 NRS § 163.120(2).  The Trust Defendants refused BB&T's demand for lists of beneficiaries.  In

18 separate orders, I required the Trust Defendants to produce a list of the beneficiaries (Dkt. #118)

19 and the parties to file briefs informing me whether they believe BB&T satisfied the statute (Dkt.

20 #123).  In their supplemental briefs, the Trust Defendants argue only that BB&T failed to serve

21 notice on the "Trust Remaindermen," that is, the individuals who would become beneficiaries if

22 the present beneficiaries die. (Dkt. #129 at 2:12-15.)  That argument fails.

23

24

25

26 [9] Because NRS § 40.459(1)(c) cannot apply retroactively to pre-enactment assignments such as the one at issue here, I do not need to reach BB&T's remaining arguments regarding that statute.

27 Nor do I need to certify to the Nevada Supreme Court any questions of law arising from the proper interpretation of "consideration" under the statute.  Accordingly, Defendants' Motion to

28 Certify Questions of Law to the Nevada Supreme Court (Dkt. #106) is denied.

BB&T contends (and the Defendants do not contradict) that Yoel Iny and Tikva Iny "are designated as lifetime beneficiaries" of the Y&T Iny Family Trust, and that "Noam Schwartz is the lifetime beneficiary" of the Noam Schwartz Trust. (Dkt. #128 at 4, 5, 16, 17.)  BB&T also contends (and the Defendants do not contradict) that these three individuals received proper notice of the claims asserted in this lawsuit. (*Id.* at 5-6.)  Based on the supplemental briefs and attached exhibits, I conclude that Yoel Iny, Tikva Iny and Noam Schwartz received proper notice under NRS § 163.120(2).  Thus, the only issue is whether the "Trust Remaindermen" should have received notice.

Defendants identify the Inys' five children as Trust Remaindermen of the Y&T Iny Family Trust, and five other individuals as Trust Remaindermen of the Noam Schwartz Trust. (*Id.* at pp. 13-14.)  Previously, however, the Defendants represented that the present beneficiaries (Yoel Iny, Tikva Iny and Noam Schwartz) are the "exclusive beneficiaries" of their respective trusts during their lifetimes, and that the Trust Remaindermen become beneficiaries only upon the death of the respective present beneficiaries. (*Id.* at 4-6.)  NRS § 163.120(2) requires only that notice be given to "each of the beneficiaries . . . who then had a present interest. . . ."  On its face, this applies to the present beneficiaries, not the Trust Remaindermen.  Defendants argue that, because "present interest" is not defined, the spirit and purpose of the statute dictate that the Trust Remaindermen should be entitled to notice and an opportunity to participate in the litigation. (Dkt. #129 at 4-7.)  That interpretation is not supported by the statute's plain language and could easily be taken to an extreme to also require notice to the future heirs or beneficiaries of the Trust Remaindermen.  Such an interpretation could greatly expand the scope of the litigation into an unwieldy process.  The statute is clearly designed to afford notice to the present beneficiaries of a trust so they can determine whether they should intervene in the lawsuit to protect their interests

in the trust property.  The notice provided in this case to Yoel Iny, Tikva Iny and Noam Schwartz satisfied the requirements of NRS § 163.120(2).

Based on the foregoing, BB&T's Motion for Summary Judgment (Dkt. #80) is granted and the Defendants' Motion for Summary Judgment (Dkt. #82) is denied.

## III.    BB&T's Application for Deficiency Judgment Hearing (Dkt. #81.)

BB&T seeks a hearing under NRS § 40.457 to determine the amount of its deficiency judgment. (Dkt. #81.)  Opposing such a hearing, Defendants again raise the issues of whether BB&T has standing to seek a deficiency and whether NRS § 40.459(1)(c) should apply in this case. (Dkt. #84 at 4-7.)  As discussed above, those arguments lack merit.  Defendants' remaining arguments are that: (1) BB&T must present evidence that the applicable London Interbank Offered Rates ("LIBOR") were not manipulated; and (2) BB&T is bound by the allegations of property value in its Amended Complaint and is thus precluded from introducing contradictory evidence. (*Id.* at 8-9.)

On May 23, 2013, Magistrate Judge Koppe addressed the LIBOR issue and ruled against Defendants, though she denied the motion without prejudice. (Dkt. #85 at 3.)  As discussed in Judge Koppe's order, the LIBOR manipulation scandal is not relevant to any of BB&T's claims.  Nevertheless, BB&T will have to prove at the deficiency hearing that it properly calculated the amount of the amount of the judgment it is seeking.

As to the second matter, BB&T is not bound to the allegation in its Amended Complaint that "[o]n the date of the trustee's sale of the Property, the fair market value of the Property was approximately $545,000." (Dkt. #5 at 6:12-13.)  Defendants contend that this allegation constitutes a judicial admission, thus barring BB&T from offering expert testimony that the value

was anything less. (Dkt. #84 at 9.)  BB&T responds that its allegation is simply an approximation, not an unequivocal statement of fact, and therefore is not binding as a judicial admission. (Dkt. #90.)

"'Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.'" *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) (quoting *In re Fordson Engineering Corp.*, 25 B.R. 506, 509 (Bankr.E.D.Mich.1982)).  Factual assertions in pleadings, unless amended, are considered judicial admissions conclusively binding on the party who made them. *Id.* (citing *White v. Arco/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir.1983)); *Fordson*, 25 B.R. at 509.  To qualify as a judicial admission, the admission must be deliberate, clear, and unequivocal. *Estate of Strickland v. Strickland*, CV-12-433-TUC-JGZ, 2013 WL 673513 (D. Ariz. Feb. 25, 2013) ("The Estate's admission that Jacaruso was the sole beneficiary before and after her marriage to Strickland was deliberate, clear, and unequivocal.  It therefore constitutes a judicial admission which the Estate cannot now retract.").  "Where . . . the party making an ostensible judicial admission explains the error in a subsequent pleading or by amendment, the trial court must accord the explanation due weight." *Sicor Ltd. v. Cetus Corp.*, 51 F.3d 848, 859-60 (9th Cir.1995).

Here, BB&T alleged in its Amended Complaint that the fair market value was "approximately $545,000." (Dkt. #5 at 6:12-13.)  This is not an unequivocal statement of fact, but rather an approximation, an estimate.  The fair market value of the subject property is "a disputed and critical issue in the litigation." (Dkt. #90 at 4.)  The parties have retained experts to appraise the value of the subject property as of the date of foreclosure.  That will be the primary focus of the deficiency hearing.  Accordingly, BB&T is not bound to the allegation in the Amended Complaint about the approximate value of the property at the time of foreclosure.

The parties are to appear at a **status check on October 16, 2014 at 2:00 p.m.** to discuss the details and scheduling of the deficiency hearing.

**CONCLUSION**

**IT IS HEREBY ORDERED THAT** Defendants' Motions for Summary Judgment (Dkt. ##79 and 82) are **DENIED.**

**IT IS FURTHER ORDERED THAT** Defendants' Motion to Certify Questions of Law to the Nevada Supreme Court (Dkt. #106) is **DENIED.**

**IT IS FURTHER ORDERED THAT** Plaintiffs' Motion for Summary Judgment (Dkt. #80) is **GRANTED**.  Judgment is hereby entered in favor of BB&T finding the Defendants liable under the Promissory Note and Guaranties.  The amount of the judgment will be determined at a deficiency judgment hearing under NRS § 40.457.

**IT IS FURTHER ORDERED THAT** Plaintiff's Application for Deficiency Judgment Hearing Pursuant to NRS § 40.457 (Dkt. #81) is **GRANTED**.  **A status check is set for October 16, 2014 at 2:00 p.m.** to discuss the amount of time needed for that hearing, and the parties', counsels', and witnesses' schedules.

DATED this 26th day of September, 2014.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE